UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 15-cr-10224 PBS |
| | ) | |
| JERRI MARTINEZ-TEJEDA, | ) | |
| YOELLY CARMENATTY, | ) | |
| GILBERTO ALICEA, | ) | |
| SAUL TORRES, | ) | |
| MICHAEL BATE, | ) | |
| JOEL ROUGEAU, and | ) | |
| LILY SOLIS, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR
RECONSIDERATION OF DETENTION ORDER**

The United States hereby opposes defendant Yoelly Carmenatty's motion for

reconsideration of Magistrate Judge David H. Hennessy's carefully considered order detaining

her on grounds of risk of flight and danger to the community.  Defendant has presented no

change in her circumstances that warrant reversing the detention order previously entered.

Defendant's pregnancy, which is the focus of her motion, was fully analyzed and addressed by

Magistrate Judge Hennessy.  The only difference is that Defendant is closer to delivering her

child and she is proposing more specific conditions on her release.  Because these proposed

conditions are either unworkable or insufficient to guarantee Ms. Carmenatty's continued

presence in the district, the government urges this Court to affirm the prior ruling.

**A.  Defendant Was Deeply Involved in a Drug Trafficking Organization**

By way of overview, the government investigated a drug trafficking organization headed

up by Carmenatty's boyfriend, Jerri Martinez-Tejeda.  Carmenatty identified herself, during the

course of intercepted text messages with Martinez-Tejeda, as his business partner.  She reminded

him that "she is the one that knows the business." Intercepted messages and telephone calls indicate that Carmenatty was heavily involved in the financial aspects of the drug trafficking, including instructing others on how much they owed and where and how to wire money to pay for drugs purchased.

On July 12, 2015, Carmenatty was in the house she shared with Martinez-Tejeda when the police forcibly entered (pursuant to a search warrant), overcoming heavily barricaded doors and a video monitoring system. Once inside, police found over $500,000.00 in cash in the process of being counted for transport. They also found numerous indications of a large-scale drug trafficking operation, including electronic scales, grinders/food processors, packaging materials and an enormous hydraulic press used to compact kilograms of heroin or other powdered narcotics. Police also found a large "hide," or hidden compartment, in the basement that could hold well over 100 kilograms of narcotics and hundreds of thousands of dollars in cash. They also found two loaded handguns in Carmenatty's and Martinez-Tejeda's bedroom.

About one month prior to the search, agents became aware that Carmenatty and Martinez-Tejeda had arranged for a shipment of narcotics from California to their location in Lawrence, Massachusetts. While the shipment was en route, the Oklahoma Highway Patrol stopped the pickup truck being used and seized over nine kilograms of fentanyl. Immediately after the seizure, Carmenatty and Martinez-Tejeda were on the telephone speaking with the two drug couriers that had been stopped (co-defendants Joel Rougeau and Lily Solis).[1] Because the couriers were not immediately detained, Carmenatty and Martinez-Tejeda suspected that they

---

[1] Both Rougeau and Solis have been indicted but only Solis is in custody, in contrast to defendant's statement that both are in custody. The potential for witness intimidation should Carmenatty be released is addressed below.

had made up a story about getting stopped so they could sell the drugs themselves.[2]  Carmenatty and Martinez-Tejeda were intercepted in numerous calls trying to arrange for someone to fly to Oklahoma and kidnap Solis in order to keep her from talking to the police and to torture her to determine the truth of what occurred.  Carmenatty was directly involved, telling Solis to stay in Oklahoma until they could send someone to "help" her and, at the same time, telling Martinez-Tejeda and another colleague that they had a big problem because "that girl will talk," referring to Solis.  The conspirators discussed torturing Solis and hired a thug from Mexico to go to Oklahoma and take care of the situation.

### B.  Defendant's Situation Has Not Changed

Counsel for Ms. Carmenatty have not presented any facts showing a change in her circumstances since Magistrate Judge Hennessy's ruling on October 6, 2015.   At bottom, counsel argues that it is unfair to detain Carmenatty because she is pregnant and that she has greater ties to the community than were recognized by the Magistrate Judge.  These contentions will be addressed in detail, but the fundamental, inescapable reality is that pregnancy is not a shield by which a defendant can avoid detention, where detention is necessary, and defendant still has ample reason to flee to the Dominican Republic.

### C.  The Legal Framework

As is familiar to the Court, the Bail Reform Act of 1984 states "if, after a hearing, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e).  In making this determination, courts must consider the following

---

[2] The shipment seized in Oklahoma is conservatively valued at $630,000.00.

factors:

> (1) the **nature and circumstances of the offense charged**, including whether the offense is a crime of violence or involves a narcotic drug;
>
> (2) the **weight of the evidence** against the person;
>
> (3) the history and characteristics of the person, including:
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, (s)he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and
>
> (4) the **nature and seriousness of the danger** to any other person or the community that would be posed by the person's release....

18 U.S.C. § 3142(g)(emphasis supplied).

Where a district court is reviewing a magistrate judge's detention order without taking new evidence, a degree of deference to the factual determinations of the magistrate judge tempers the independent review. *See United States v. Tortora*, 922 F.2d 880, 882–83 (1st Cir.1990); *United States v. Simone*, 317 F.Supp.2d 38, 42 (D.Mass.2004). The Court may take additional evidence and review the facts *de novo,* but should give due weight and consideration to the findings made by the magistrate judge. *Id.* This is especially appropriate where the magistrate judge has reviewed extensive statements of the facts of the case through search warrant and complaint affidavits. That is the case here: Magistrate Judge Hennessy is very familiar with the facts of defendant Carmenatty's involvement in the charged crime, the attempt to intimidate and/or torture a

witness, and the overall strength of the government's case based on his review of
multiple affidavits.

With regard to the risk of flight as a basis for detention, the government must prove by a
preponderance of the evidence that no combination of conditions will reasonably assure the
defendant's appearance at future court proceedings. *United States v. Vortis*, 785 F.2d 327, 328-29
(D.C.Cir.) (1986).  With regard to danger, however, there is a heightened standard of proof
because of "the importance of the interests of the defendant which are implicated in a pretrial
detention hearing." S.Rep. No. 225, 98th Cong., 2d Sess. 22, reprinted in 1984 U.S.Code Cong.
& Admin. News 3182, 3205. Thus, clear and convincing evidence is required to establish the
facts relied upon to support a finding that no combination of conditions will reasonably assure
the safety of any other person or the community. *United States v. Simone*, 317 F.Supp.2d 38 (D.
Mass. 2004); 18 U.S.C. § 3142(f).  The United States has moved to detain defendant Carmenatty
on both flight and dangerousness grounds.

**D.   Defendant Poses A Significant Risk of Flight**

1.  Defendant has minimal ties to the area:  Magistrate Judge Hennessy made it clear to
defendant that he would not consider releasing her unless she interviewed with Pretrial Services.
During the course of that interview, as reported to the Court by Pretrial Services, Carmenatty
said she had limited family here.  Defense counsel now claims (without introducing any
evidence) that Carmenatty has four siblings living in Massachusetts.  Why she withheld this
information from Pretrial, if it is in fact true, is unclear.  What is clear is that Magistrate Judge
Hennessy took her words to Pretrial at face value when he found that she had minimal family ties
here.

It remains undisputed that Carmenatty's twelve-year old son is in the Dominican Republic, as are her parents.  Carmenatty is a lawful permanent resident but that will likely change if she is convicted.  Carmenatty has been separated from her husband for some time; he is not the father of her twelve-year old nor of her current pregnancy.  The father of her twelve-year old is in the Dominican Republic.

Defendant voluntarily terminated her employment with Arbor Home Care, according to a representative of Arbor, on July 4, 2015 without any advance notice and after working for about five months part-time.[3]  She quit nine days before the search warrant was executed.  No other evidence of employment has been presented, and, indeed, Magistrate Judge Hennessy was concerned about the apparent discrepancy between her limited, and low-level, employment and her ownership of two luxury cars.  Clearly, she has no work ties that will keep her in the United States.

2.  <u>Defendant has an incentive to flee</u>:  However, because there is ample evidence in the investigation that defendant Carmenatty, along with her boyfriend Martinez-Tejeda, were dealing in multiple kilograms of heroin, and that at the time of their arrest they were gathering approximately $500,000.00 which was intended for the purchase of at least seven kilograms of heroin, the government still expects that defendant Carmenatty will face a maximum penalty of life in prison.  It is likely that the government will file money laundering charges against her, and possibly allege an amount of heroin that triggers a ten year mandatory minimum sentence upon conviction.  Faced with the potential that she will be incarcerated for multiple years, during which time she will be separated from her child, defendant has ample incentive to flee to her homeland.  If the government proves that the conspiracy was involved in the distribution of more

---

[3] She was not working up until her arrest, as suggested by Defendant (Memo. at p. 10).

than one kilogram of heroin, defendant faces a mandatory sentence of not less than ten years.
*See* 21 U.S.C. § 841(b)(1)(A).

Nor is it persuasive that Defendant will be "recovering from surgery and nursing a baby."
Recovery from a Caesarian delivery is not, absent unusual complications, a lengthy process and
nursing a child is hardly an impediment to travel.  Simply put, she will run.  And there is no set
of conditions that will keep her here once she is released.

3. <u>Defendant has the means to flee</u>:  During the course of monitoring Martinez-Tejeda's
telephone calls, evidence that Martinez-Tejeda and Carmenatty were transferring money back to
the Dominican Republic was discovered.  Intercepted telephone calls during the investigation
indicate that the drug trafficking organization has transferred money to the Dominican Republic.
It has also been reported that the government failed to find a large sum of cash that had been
hidden by Martinez-Tejeda and Carmenatty in their Lawrence home.  Whether this is true or not,
it is clear that the drug trafficking organization generated substantial sums of cash and a portion
of that cash has been stashed, most likely in the Dominican Republic and the Lawrence,
Massachusetts area.  Further, the drug trafficking organization has significant ties to drug
traffickers in California and Mexico.  And Carmenatty was the business person in the
organization, so she knows where the money is better than anyone.  She has ample resources to
support herself should she decide to flee.[4]  She can easily purchase a new passport and identity
documents with the money at her disposal.

---

[4] In this regard, Defendant's statement at page 9 that the Magistrate Judge found that the only
assets she has are $3,000 is misleading.  The Magistrate Judge did not purport to find that this was the
sum total of her assets and the government strongly believes it is not.

4. <u>Defendant's proposed conditions are unworkable and insufficient</u>:  Defendant poses a series of conditions which at first appear comprehensive.  Upon closer examination, however, it can be seen that the proposals fall short:

a.  Home confinement with "24-hour-a-day lock-down."   Defendant is proposing to reside with her sister in a residential setting.  There is no "lock-down" available.  The doors to the home will not be locked from the outside and the windows barred.  Home confinement is, at bottom, a condition that does not prevent flight, it merely provides notice of a defendant's non-compliance *after* the fact if (and only if) it is combined with electronic monitoring.

b.  GPS monitoring.  GPS monitoring would allow the government to know if Defendant has fled; it does little to prevent flight.  Moreover, there are likely ways to remove the device and defeat its core function- to show where the defendant is at every moment.  "[W]here, as in this case, there is a particularly strong incentive to flee, the early detection capabilities of electronic monitoring may be insufficient to overcome that incentive and to guard against the risk of flight," *United States v. Neves*, 11 F. App'x 6, 9 (1st Cir. 2001).

c.  Reside with her sisters.  Everyone knows that family is aligned with their kin first, and with requirements imposed by the Court a distant second.  In addition, and most importantly, the government has evidence that Carmen Beltran, the person proposed as a third-party surety, was involved in the drug trafficking organization's money laundering activity.  Ms. Beltran was also present at the time the search warrant was executed on Defendant's residence,

when over half a million dollars was out in the open, mostly on the dining room table, being counted and the house was barricaded.

d.  Unsecured appearance bond.  The description says all the Court needs to know about this proposed condition:  the bond, and therefore the defendant, will be unsecured.  Moreover, the amount is relatively insignificant given the amount of money that flowed through the criminal organization.

e.  Surrender of her green card and agreement to forfeit.  The government does not believe this would provide additional incentive for Defendant to stay.  If she flees, she knows that she will be subject to having her residency status revoked, and there is some doubt as to whether a voluntary agreement to forfeit such status is enforceable.[5]

f.  Surrender of her Dominican passport.  Defendant can obtain additional documents, if she does not already have them, to flee the country.  She could also cross into Mexico without documentation surreptitiously, and has the money to hire someone to help her.  Once in Mexico, she has additional resources available should she decide to move beyond that country.

g.  Random drug screening.  Substance abuse is not an issue in Carmenatty's detention.

h.  Residence subject to random searches by Probation.  Any home confinement allows Probation to inspect the residence unannounced.  But Probation cannot be making daily, much less hourly, checks to see if Defendant is

---

[5] It does not appear that a federal District Court has the authority to order Immigration and Customs Enforcement to alter a person's residency status.

still in the residence.  Therefore, this would, at most, provide insufficient and untimely notice that Defendant has already fled.

i.  Limitations on visitors.  This is unenforceable, not only because other people will be living in the residence, but also because there is simply no real way to know if Defendant is complying short of maintaining 24-hour surveillance. And that is not feasible.

j.  Avoid contact with potential witnesses.  This is similar to the above proposal; it sounds good but is unworkable.  Agreeing to it and abiding by it are two different things, and in this case, where Defendant has already shown a willingness to use violence against a co-defendant, there is every reason to doubt her commitment to this condition.

k.  Monitoring of a land line.  This suggestion seems to be that Defendant will agree to allow the government to tap a newly-installed landline.  Defendant will know the line is being monitored.  Clearly, she will not use the landline to communicate anything about flight plans or witness intimidation or resumption of drug trafficking.  She will use a cellular phone purchased by one of her sisters instead.  And the cost of monitoring the landline, which would be substantial (likely in the tens of thousands of dollars) has not been addressed.

i.  No cellular phone or internet use.  This is unenforceable as well.  It sounds good, but provides no real assurance as it is entirely voluntary and not subject to meaningful compliance monitoring.

In sum, none of the conditions proposed by Defendant, nor any of them in combination,  will ensure her appearance at future judicial proceedings nor will they

guarantee that Defendant will not re-engage in the family's drug trafficking business and attempt to destroy evidence or intimidate witnesses.[6]

### E.  **Defendant Poses a Risk to the Community**

      1.  The presumption under 18 U.S.C. § 3142(e)(3)(A) applies:  The presumption that no set of conditions will reasonably assure the appearance of the defendant and the safety of the community applies here because the Magistrate Judge has found that there is probable cause (based on the grand jury's indictment as well as the Magistrate Judge's review of the fact) to believe that Carmenatty has committed a drug offense for which the maximum term of imprisonment is ten years or more; *see* 18 U.S.C. § 3142(e)(3)(A).  Defendant is charged with a conspiracy to distribute multiple drugs, including heroin, fentanyl and cocaine.  There is very substantial evidence that the conspiracy was dealing in multiple kilograms of heroin, for which the maximum period of incarceration would be life.  The proof of defendant's involvement in the fentanyl portion of the conspiracy is also substantial.[7]  Defendant has not, and cannot, meet her burden of establishing by clear and convincing evidence that there is a set of conditions which will ensure her appearance and protect the safety of the community.

      Heroin and fentanyl present an enormous risk to the community.  Hardly a week goes by without a newspaper article describing a fatal overdose on heroin.  Fentanyl is even stronger, by

---

[6] Nor is the fact that Defendant will be hospitalized after her delivery reasonable assurance against flight.  First, this is a very short-term situation.  The average hospital stay post-Caesarian section delivery is  two to three days; *see, e.g.* http://www.webmd.com/baby/tc/cesarean-section-what-to-expect-after-c-section; http://www.mayoclinic.org/tests-procedures/c-section/basics/what-you-can-expect/prc-20014571 (accessed 11/27/2015).  Second, defendants can and do flee from hospitals; the Court need look no further than defendant Saul Torres in this case.  He fled from a hospital after being bitten by a police dog when he attempted to escape arrest.  He remains at large.

[7] The maximum period of incarceration for trafficking fentanyl (regardless of weight) is twenty years, *see* 21 U.S.C. § 841(b)(1)(C).

weight, and can cause respiratory depression and death just as heroin can.[8]  Defendant

Carmenatty was, in her own words, a business partner of Martinez-Tejeda's and we should

expect that if she is released she will take over the running of the drug trafficking organization

while he is in custody.  Any additional sales of heroin or fentanyl pose an unacceptable risk to

the community.

There is also a very real chance that Carmenatty will hide, dissipate or otherwise conceal

assets of the drug trafficking organization.  She knows which bank accounts hold funds and

where money has been hidden.  She may also take further steps to intimidate witnesses or any

co-defendant that might want to cooperate with the government's investigation.  We have seen

from the intercepted telephone calls that she was willing to subject co-defendant Lily Solis to

kidnap and torture when she thought Solis and Joel Rougeau had stolen the fentanyl shipment.

Carmenatty presents a danger to the community at large and to persons involved in the

investigation, therefore.

### F.  **Defendant's Pregnancy Can Be Treated Appropriately**

Defendant's pregnancy is a medical condition which the prison system has been treating,

and will continue to treat, appropriately.   Undersigned counsel has consulted the Marshal's

Service as well as Wyatt Detention Facility Medical Unit personnel.  Both sources indicated that

---

[8] *See, e.g.,*  http://www.medscape.com/viewarticle/841683 (accessed 7/31/2015):  "Drug incidents and overdoses related to fentanyl are occurring at an alarming rate throughout the United States and represent a significant threat to public health and safety," DEA administrator Michele M. Leonhart said in a statement. "Often laced in heroin, fentanyl and fentanyl analogues produced in illicit, clandestine labs are up to 100 times more powerful than morphine and 30 to 50 times more powerful than heroin," she added. *See also* http://www.boston.com/news/local/maine/2015/07/31/heartbreaking-obituary-rips-maine-governor-drug-policy/RKpXkbegCog5FbZW054MLJ/story.html?s_campaign=Email:Extra.   The trend is confirmed by the following statistics reported by neighboring Rhode Island: "The state medical examiner's office reported that toxicology screenings have been conducted so far on 46 of the 51 people who died of apparent overdoses this year. Of those 46 tested, 34 people - 74 percent - screened positive for fentanyl."   Providence Journal, March 17, 2015.

they have dealt with pregnant prisoners before on a number of occasions.  Wyatt staff in the

Medical Unit indicated that pregnant prisoners are taken to a separate health care facility for any

needed services in addition to the medical care available within the facility.

Defendant has not claimed that her care has been inadequate.  On the contrary, she only

makes the unsupported claim that she should be treated by the doctor of her choice.  Apart from

the absence of any facts or argument as to why that would make a difference, there simply is no

constitutional right for a pretrial detainee to be released on the ground that the prisoner wants to

see a different doctor.

There is no compelling reason, therefore, to release defendant on the ground that she is

pregnant.  *See, e.g., United States v. Garivay*, 2013 WL6577320 (D. Ariz. 2013) (*unpublished*)

(pregnancy not a sufficient ground to overcome presumption in favor of detention).[9]

## CONCLUSION

For all of the foregoing reasons, the government urges the Court to detain defendant

Yoelly Carmenatty.   If released, she is will flee and she poses a risk to the community and to the

preservation of evidence in this case.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:      */s/ Thomas E. Kanwit*

---

[9] The government rejects Defendant's argument that the present motion can be compared to detention determinations in other cases.  Each case stands on its own facts, and there are many reasons why the cases cited by Defendant are not comparable to this one.  Not least among them is that the defendants in those cases had much greater ties to Massachusetts, and, indeed, to the United States, than does Carmenatty.  Additional medical conditions existed in one of the cases cited, as well as more stringent conditions of release;  *see United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991).  In the other case, the court found that the defendant lacked financial support to flee, was married and had no current ties abroad;  *United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990).  None of these factors are the same for Ms. Carmenatty.

THOMAS E. KANWIT
Assistant U.S. Attorney

Dated:  November 27, 2015

 

Counsel certifies that this document was filed via the CM/ECF filing system in the District of Massachusetts on this date and that defense counsel will be served via that system. Counsel further certifies that he has consulted with counsel for defendant in an attempt to resolve the issue(s) presented herein.

*/s/ Thomas E. Kanwit*
THOMAS E. KANWIT